# Staunton

## L. E. WARD v. BANK OF POCAHONTAS.

September 11, 1936.

Present, Campbell, C. J., and Holt, Hudgins, Gregory, Browning and Eggleston, JJ.

The opinion states the case.

*Sexton & Sexton,* for the appellant.

*Robert O. Crockett,* for the appellee.

HOLT, J., delivered the opinion of the court.

We are to determine if appellant is liable as endorser on a certain negotiable note of $4,250, of date December 13, 1927.

There were two banks in the town of Pocahontas, Virginia

—the First National Bank of Pocahontas and the Bank of Pocahontas. In October, 1926, the First National Bank of Pocahontas, because of embezzlement by its cashier, was forced to suspend. For public reasons and not for private profit, the Bank of Pocahontas was willing to take over its affairs. An agreement to that effect was made, was reduced to writing and bears date November 14, 1926. The substance of it is this:

The Bank of Pocahontas was to take over all assets of the failing bank and was to pay its debts. As a part of this transaction W. R. Graham, H. P. Brittain, H. W. Hicks, R. C. Harrison and L. E. Ward, directors in this failing bank, agreed to execute a bond of indemnity in the sum of $50,000, which bond was to cover any loss which might be suffered by the Bank of Pocahontas because of said assumption. It was further provided that if the assets taken over were more than sufficient to pay the debts, such surplus should be turned over to W. R. Graham, L. E. Ward and H. W. Hicks, who were to distribute the same among their shareholders. This bond was duly executed.

These directors were doubly interested—interested because of their investments as stockholders already made, and interested because of the double liability which rested upon them as stockholders of a national bank.

Graham, Hicks and Ward were designated as a "liquidating committee," whose duty it was "to assist in closing the affairs of the defunct bank."

Among its assets were two notes, one of Paul S. McIlhaney on which there was a balance due of $1,180.49. The other made by Robert S. Gaines, and on it there was due $90.35. Any collections made on their account correspondingly decreased the contingent liability of stockholders and the liability imposed by the contract of indemnity given as aforesaid.

At that time there was in being the South Bluefield Extension Inc., a corporation of the State of West Virginia, organized for the purpose of buying and selling real estate. Gaines was its president and McIlhaney its secretary. This

land company owned certain lots in Bluefield and by resolution of November 30, 1927, authorized its officers to negotiate a loan for $4,500 with the Bank of Pocahontas, to be secured by trust deed on them. The proceeds of this loan were to be and were used to pay off certain liens upon them including the Gaines and McIlhaney note. The note itself was for $4,250 and when it had been discounted and its proceeds had been applied as aforesaid there was a balance of $411.90, which was turned over to its maker, the South Bluefield Extension, Inc.

Since the bank, as part of its security, was to be given this trust deed, it was interested in seeing that the title was clear, that prior liens were removed, and that the proceeds of this note were properly applied. That it was permitted to do.

The note itself reads:

"$4250.00 . Copy Pocahontas, Va., Dec. 13, 1927
"Four months Days after date, for value received We promise to Pay to the order of Robert W. Gaines without offset, negotiable and payable at the Office of Discount and Deposit of the
"BANK OF POCAHONTAS, POCAHONTAS, VIRGINIA
"The sum of Four Thousand Two Hundred Fifty & no/100 Dollars
"The maker and every endorser of this note waive the benefit of their homestead exemptions as to this debt and, also waive demand, notice and protest thereof and further agree if said note is not paid at maturity and be collected by attorney to pay a commission of ten per cent on said claim as an attorney's fee.

"SOUTH BLUEFIELD EXTENSION, INC.,

ROBERT W. GAINES

President.

PAUL S. MCILHANEY,

Secretary.

"No. 45633      Due      April 13

Pocahontas, Va. — Protested for non-payment this 13th day of April, 1928.

Notary Charges $1.36

"J. K. SULT,
N. P.

"(On the back)
Robert W. Gaines
H. W. Hicks
W. R. Graham
L. E. Ward
Liquidating Committee First National Bank of Pocahontas, Va.
H. W. Hicks
W. R. Graham
L. E. Ward"

This note was not paid at maturity and nothing was done until 1932, when it was renewed by Graham and Ward. As renewed it reads:

"$ 105.04 Int.

5252.00        Pocahontas Va., Mar. 19. 1932.

————

5357.04

"Four months Days after date for value received We promise to pay to the order of Bank of Pocahontas without offset negotiable and payable at the Office of Discount and Deposit of the

"BANK OF POCAHONTAS, POCAHONTAS, VIRGINIA

"the sum of Five Thousand Two Hundred Fifty-two no/100 Dollars with interest from date

"The maker and each endorser of this note hereby waive the benefit of their homestead exemptions as to this debt and also waive the presentment of this note, demand for its payment and the protest notice of dishonor and non-payment thereof, and do hereby jointly and severally agree to pay all costs and expenses of collecting the same, including attorney's fee of 10% thereof if it shall either be placed in the hands of

an attorney for collection, or be collected by an attorney.

"W. R. GRAHAM
Bluefield, W. Va.
L. E. WARD
City.

"As collateral for payment there is held by payee South Bluefield Extension, Inc., note for $4250.00 secured by deed of trust.

"No. 65268          Due July 19, 1932"

On November 28, 1932, motions for judgment on each of these notes were filed in the Circuit Court of Tazewell county, and to each of them pleas of *nil debit, non assumpsit,* and in abatement were interposed. The pleas in abatement rested upon the theory that each motion was based upon the same debt. As a matter of fact the note for $5,252 at the time of its execution did represent the $4,250 debt with interest, counsel fees, etc.

On January 31, 1933, Ward filed his bill for injunction and asked that prosecutions of these actions at law be restrained. They were restrained by decree of February 16, 1933, but upon condition that he confess judgment on the $4,250 note, which was accordingly done.

By decree of April 8th the plea in abatement as to the action on the $5,252 note was sustained and the judgment confessed on the $4,250 note was validated and confirmed. It is from that decree that this appeal is taken.

Since this judgment rests upon the $4,250 note and since want of consideration and fraud is charged, it is necessary that we look in some detail to the circumstances under which it was executed. As an accommodation endorser no consideration is necessary. Code, section 5591. The proceeds of this note went in part, as we have seen to pay the McIlhaney note, $1,180.49, and the Gaines note of $91.35. Had these notes not been paid, loss so suffered would have fallen on the makers of the bond of indemnity given to the Bank of Pocahontas and on the stockholders of the First National Bank of Pocahontas. This liability in both of its

aspects rests upon Ward. He was something more than an accommodation endorser. At the same time it is doubtless true that he did not expect to have to pay anything on account of this $4,250 note, and it would have been very unwise in him to assume an obligation to this extent that he might be relieved from those imposed by the McIlhaney and Gaines note, although men do unwisely assume obligations as accommodation endorsers where there is no possibility of personal benefit.

As a matter of fact, we have to deal with an ordinary banking transaction. The South Bluefield Extension, Inc., wished to secure a loan to pay off certain debts which bound its property. There was nothing unusual in this. It applied to the Bank of Pocahontas and tendered its note, secured by a trust deed on this land and by endorsement of the members of the liquidating committee of the First National Bank of Pocahontas. This note was presented for discount by Mr. Graham to Mr. C. M. Galloway, vice-president of the Bank of Pocahontas, and it was with him that negotiations were taken up. He took the advice of counsel and was told that these gentlemen as members of the liquidating committee had no power to endorse a note. In the light of that advice the bank would have had nothing to look to except the trust deed on the Bluefield lots. There would have been no personal liability at all and so Mr. Galloway told Mr. Graham that the bank could not discount this note unless personal endorsement was secured. Mr. Graham took it out and secured satisfactory endorsements, among them Ward's. Thus endorsed it was tendered and accepted. There is some conflict in testimony as to the manner in which Ward's endorsement was secured, but the statement which we have made is sufficiently supported by the evidence.

The bank did not ask Ward to endorse this note, it did not suggest that he be asked, and it held out to him no inducements. It would be quite unusual when a loan was sought for the bank to say to an applicant, "Your note must have additional endorsements," and to say to a prospective endorser, "If you will sign we will see that you are never

called upon to pay." Plainly, evidence to establish such an inducement would have to be clear and cogent before it would be convincing. No such state of facts has been established here, although that is the substance of Ward's contention. He said that his endorsement was secured not to add solvency to the note, and not for the purpose of imposing any personal liability upon himself, but merely that it might mislead the bank examiner and be accepted among the bank's solvent assets.

We think it entirely true that Ward was under the impression that he would never be called upon to pay, but for that impression the bank was not responsible.

We have seen that this note was secured by a trust deed on certain Bluefield lots. They were then believed to be sufficient in value to protect it. Indeed Graham told Ward that they were, but Graham did not represent the Bank of Pocahontas and so that bank was not responsible for any representation which he made.

In stark form, Ward's contention is this: Under a parol contemporaneous agreement, no liability rests upon him by reason of his endorsement. It is said: "Ward, by his endorsement of said note, did not undertake to pay the same or any part thereof in the event of failure of maker of said note to pay." This is an untenable claim.

In *Crafts* v. *Broadway Nat. Bank*, 142 Va. 702, 128 S. E. 364, 365, it appears that the Crafts Piano Company gave to the bank its note with a certain collateral. The bank became uneasy and upon its insistence A. J. Crafts, who was president of the piano company, endorsed it. He was called upon to pay and in his defense said:

"My understanding was that I was to give him the collections each month for the preceding month and as long as I did that he would not call the note, but he wanted my endorsement for the purpose of satisfying the bank examiner, he said."

It was held that no such defense could be interposed.

In *Coal River Collieries* v. *Eureka Coal & Wood Co.*, 144 Va. 263, 132 S. E. 337, 46 A. L. R. 485, a note was signed

by the coal company and by "N. Orleans." Orleans defended upon the ground that he was not personally liable but signed in his capacity as president of that company.

Again it was held that this was an unambiguous promise to pay and could not be wiped away by parol evidence.

See also, *Whitaker* v. *Lane*, 128 Va. 317, 104 S. E. 252, 11 A. L. R. 1157, and *Conway* v. *American Nat. Bank*, 146 Va. 357, 131 S. E. 803.

In the instant case there is no cross-assignment of error as to the admissibility of this evidence. Probably because plaintiff thought that, with it in, the claim made was not proven.

The situation was this: The Texas Oil Company had in mind the purchase of this property and had indicated that purpose to Graham, the purchase price discussed being $5,000, but the oil company then changed its plans and was no longer in the market. Real estate values fell away. Graham undertook without success to interest other possible purchasers, but the market was such that no one interested advised a sale and no sale could have been made except at a sacrifice. For that reason nothing was done.

When this litigation was begun the bank had two sources from which payment might have been demanded. It might have proceeded against endorsers and it might have looked to its trust deed. It might have done both. It could have proceeded at its election and without prejudice to its rights.

It is contended that this failure to act released these endorsers from liability.

"It appears to be well established that, apart from an express statutory provision in that regard, or an agreement between the parties (or possibly circumstances creating some controlling equity), the mere failure or delay, on the part of the holder of a note, to enforce collateral security available to him, is not of itself sufficient to operate as a release of an indorser of the note from liability thereon." 74 A. L. R., page 130.

"While the authorities appear to be in entire agreement on the proposition that a surety is discharged, at least to the extent of the value of the security lost, where the

creditor, without the surety's consent, affirmatively releases collateral security, there seems to be some difference of opinion where a loss is claimed to have occurred through the inactivity of the creditor. The general rule, however, is that in the absence of an express agreement to use diligence, or a special request to act, or such peculiar circumstances as to render prompt action of the creditor an absolute duty, mere inaction or passive negligence on the part of the creditor in failing to take steps to secure the collection of his debt from collateral security given to him by the principal debtor is not sufficient of itself to discharge or release a surety from his obligation to pay the debt." 21 R. C. L., page 1055.

These statements of the general law accord with our own decisions.

"It is perfectly well settled, and has been very properly conceded in the argument, that a surety is not absolved by the want of diligence on the part of the creditor in regard to his demand against the principal debtor. A defense on the ground of mere *laches* would, indeed, be inconsistent with the relation of the parties." *Humphrey* v. *Hitt*, 6 Gratt. (47 Va.) 509, 523, 52 Am. Dec. 133; *Wells* v. *Hughes' Ex'r*, 89 Va. 543, 16 S. E. 689; *Coleman* v. *Stone*, 85 Va. 386, 7 S. E. 241.

A surety can never charge a creditor with *laches* until he has in vain prompted the creditor to pursue the principal. The creditor need not move until he has been notified. *Coles' Adm'r* v. *Ballard*, 78 Va. 139; *Alexander* v. *Byrd*, 85 Va. 690, 8 S. E. 577; *Manson & Shell* v. *Rawlings' Ex'rs*, 112 Va. 384, 71 S. E. 564.

Indeed the Code itself tells us what an endorser must do when he desires action where a right of action has accrued. He must give notice of his desire in writing to the creditor. Code, section 5774.

Here no such notice was given and if reason for delay was necessary it is furnished by the failing market for real estate. Ward had the same knowledge of these conditions that others had and kept quiet. It seemed well to let a sleeping dog lie.

The failure to file the note as a claim in bankruptcy

against H. W. Hicks, a prior endorser, does not release the complainant. The law seems to be that such failure is not sufficient to release the endorser even where the principal debtor is in bankruptcy, and the rule would apply with even more force where the bankrupt is one of the endorsers. See 21 R. C. L., page 1040. Nor does it appear that any loss followed this failure.

As we have seen, the judgment confessed was judgment on the first note. Ward in his testimony said that his endorsement of the second note was given with the distinct understanding that his rights were not affected thereby. If his rights were not affected his liabilities were not. With this in mind we have not considered it necessary to discuss the evidential value of the second note and of his endorsement. That no rights were lost appeared by this endorsement thereon:

"As collateral for payment there is held by payee South Bluefield Extension, Inc., note for $4250.00 secured by deed of trust."

In passing it is of interest to note that Mr. Graham, whose liabilities are as those of his co-endorser, Dr. Ward, has never claimed that he is not bound.

Though the record is large, this case is simple. There was no fraud. The bank, as banks often do, required personal endorsements. It made no demand upon Ward. His endorsement he freely gave. He is liable thereon as an accommodation endorser and he is liable because the proceeds of this note in part went to pay debts which otherwise would have been charged against his indemnity bond. He has never demanded, as he might under the statute have demanded, that the bank proceed to enforce its trust deed.

He was told that the security which it afforded would save him harmless, but the bank did not tell him. Indeed if he had been told by the bank that this note would never be enforced against him it would have been an assurance upon which he could not rely.

The decree appealed from is plainly right and must be affirmed.

*Affirmed.*